## Case No. 254.

### The ALMATIA.

[1 Deady, 473;[1] 1 Amer. Law T. Rep. U. S. Cts. 133; 1 Chi. Leg. News, 129.]

District Court, D. Oregon. Nov. 12, 1868.

SEAMEN—WAGES—FORFEITURE FOR MISCONDUCT—SHIPPING ARTICLES IN DEROGATION OF LEGAL RIGHTS.

1. A justifiable discharge of a seaman by the master, for bad conduct, will work a forfeiture of the wages previously earned.

[See The Magnet. Case No. 8,955; The John Martin, Id. 7,358; Relf v. The Maria, Id. 11,692.]

[See note at end of case.]

2. Courts of admiralty will not [wholly] forfeit a seaman's wages for a single act of disobedience, however [if] trivial or provoked.

3. A stipulation in shipping articles in derogation of the general rights of seamen, as established by the maritime law, is void, unless it was fully and fairly explained to them, and additional compensation allowed them, adequate to the restrictions and risks imposed thereby.

[See The Australia, Case No. 667.]

In admiralty.

O. P. Mason, for libellants.

W. W. Page and W. W. Thayer, for claimants.

DEADY, District Judge. This is a suit in rem for seaman's wages. The defence set up in the answer is desertion and disobedience of orders, whereby the libellants forfeited their wages. The material facts are as follows: The libellants, George Mills, Albert Miller, Frank Stizleye, Nels. Nelson, William Nelson, Henry Nelson, Howell Lewis and John Lewis, between the fourteenth and twentieth of August, 1868, shipped as seamen on the Almatia, then lying at the port of San Francisco, for a voyage to the port of Portland-on-Wallamet, and thence back to the port of departure. The bark sailed from San Francisco on September 1, and made the dock at Portland on the thirtieth of the same month. Upon reaching the latter port, the first mate was immediately paid off and discharged, but for what reason does not appear. The second mate then acted as first officer, and proceeded with the discharge of cargo. The libellants were the only seamen on board. On Sunday morning, October 4, the second mate called the men out about six o'clock, and set them to doing the ordinary work about ship. They washed down the decks, and furled four sails which had been loose since the Tuesday previous. The weather was calm and dry. When this work was done, the second mate ordered the libellants to loose and unfurl the foresail. This sail had been furled the Tuesday previous by the order and under the direction of the first mate. It was then half-past eight o'clock, and the custom was to have breakfast on Sunday morning

at eight. There was no necessity of unfurling the sail at that time. To this order the men replied that it was after eight o'clock and they wanted their breakfasts. The officer immediately reported this answer to the master, who had the men called aft. On coming aft, the master asked the men what was the matter? They answered that they wanted their breakfasts. To this the master replied—You want your breakfasts, do you? The master then asked if they would furl the sail; they replied that it was after eight o'clock. and they wanted their breakfasts. The master then said—You refuse duty then; mind, you got nothing coming to you. The men replied—We don't refuse to do our duty, but we want our breakfasts. The master then ordered the second officer to go ashore and get men to furl the sail. The officer did so, but none were obtained, and the sail was not refurled until the following Monday evening. No more notice was taken of the men.

By the direction of the master, the cook allowed them breakfast, dinner and supper on Sunday. The men slept on board, but were not called to turn out on Monday morning. About half-past seven, they applied to the cook for breakfast, but he refused them, as the master had given him orders not to let them have any. About this time a gang of longshoremen came on board and commenced to discharge cargo. The libellants then went to the master on the wharf, and asked him what he was going to do with them. The master said he didn't know them; that they took charge yesterday morning, and he would have nothing more to do with them. The men said they had not "taken charge." The master replied—You refused to work. Then the men asked if they could go ashore. The master answered —I don't tell you to go ashore. The men then asked him if he would pay them. The master at first said he might, if anything was coming to them; and then said no, get it out of the ship, if you can. Thereupon the libellants left the bark, and brought this suit for wages.

Upon this state of facts, the defence of desertion must fail. The libellants remained on board the vessel for twenty-four hours after their qualified refusal to furl the foresail, ready and willing, so far as appears, to do duty whenever called upon. During all this time no attention was paid to them, or orders given them by the officers; and finally, by direction of the master, they were denied their usual food. On Monday morning, when the libellants finally applied directly to the master for orders, he said that he did not know them, and in effect that he was done with them. This was a discharge by the officers, and not a desertion by the crew. Desertion by the maritime law is a quitting the ship and her service without leave, and against the duty of the party, with no mind to return again. Cloutman v.

Tunison, [Case No. 2,907.] These libellants left the vessel with no mind to return, but not until they were in effect bidden to do so, by the language and conduct of the master and mate.

It being ascertained that the libellants did not desert the vessel, but were discharged therefrom at an intermediate port, it remains to be considered whether the discharge was justifiable or not. A justifiable discharge of a seaman by the master, for bad conduct, will work a forfeiture of the wages previously earned. This is a rule of justice and policy which pervades the maritime law. 3 Kent, Comm. 198. But it is not every trivial act of disobedience or neglect of duty that will justify the discharge of a seaman, or work a forfeiture of his wages. In the case of The Mentor, [Case No. 9,427,] Mr. Justice Story discusses this question at great length. He says: "There must be a case of high and aggravated neglect or disobedience, importing the most serious mischief, peril or wrong; a case calling for exemplary punishment and admitting of no reasonable mitigation; a case involving a very gross breach of the stipulated contract for hire, and going in its character and consequences to the very essence of its provisions." And again, he says: "I should be very sorry, indeed, to lay it down as a general proposition, that any act of disobedience by a seaman, however slight, is, of course, to be visited with a forfeiture of wages, or will justify a master in dismissing him in the course of the voyage. Such a principle, it seems to me, would be very disastrous to the commercial interests of the country, and would involve so many difficulties in the application, that the denial of wages would soon, from the necessities of the case, with reference to the ordinary habits of seamen, introduce an essentially different contract into maritime employment. My opinion is, that the disobedience must either be an act of very gross nature, involving serious danger, a mischief or malignancy; or it must be habitual and produce such a general diminution of duty as goes to the very essence of the contract." To the same effect is 3 Kent, Comm., supra. The case of The Mentor, supra, involved the consideration of the consequences of an attempt to create a revolt on ship board. The learned judge, in the course of his opinion, declared that even the commission of such an offence is not "in all cases, to be visited with a total forfeiture of wages;" and by way of illustration adds, "Cases may easily be conceived, where the seamen have, in a legal sense, committed the offence, and yet under such circumstances of gross provocation and misconduct on the part of the master, as to form a very strong excuse, addressing itself to the conscience and mercy of the court."

Taking these rules and principles as a guide for the decision of this case, it is plain that the discharge of the libellants was not justifiable, and that they ought [not] to forfeit their wages for the single act of the qualified refusal to refurl the foresail on Sunday morning. The first mate had been discharged and the second mate had taken his place. It is quite probable that the libellants, in feeling at least, in this matter, took part for the first mate and against the second one. It is equally probable and even more so, that the second mate regarded the crew with disfavor and intended to hector them out of the vessel and get rid of them. There was no trouble on board with the libellants, until he became first officer. The libellants have been before the court and four of them were examined as witnesses. They appeared very well for men in their station of life, and those of them who were upon the witness stand gave their testimony intelligently and candidly. One of them had been on the ship for three years continuously. The testimony for the claimants, consists of the depositions of the master and second mate, and a third person who appears to have been idling on the dock at the time of the altercation between the men and the officers on Sunday morning, and overheard and saw a part of what was then said and done. The cook was the only person on board who was not an actor in the scene of Sunday morning. His testimony has not been offered. No reason is given by the claimants for not producing him or his deposition. For aught that appears he is still on board the bark and within their control. The circumstance must have some weight against the claimants upon the questions of fact in dispute between them and the libellants. The mate testifies that it was necessary to the safety of the vessel to refurl the foresail on that Sunday morning. The sail had been furled under the direction of the first mate and had been in that condition since the previous Tuesday, and so remained until the evening of the following Monday. The vessel was fast alongside the dock, one hundred and twenty miles from sea, and the weather was and had been calm and dry. This statement of the mate's is incredible and it cannot be supposed but that he knew better. Its falsity is evident to any one, and is shown by the testimony of the libellants and that of the ship-masters, Smith and Freeman. These circumstances are enough to throw discredit upon the testimony of the mate.

The force of the master's testimony is impaired by the fact that he was intoxicated on Sunday morning, when the affair took place, which was made the occasion for discharging the libellants, without paying their wages. It is altogether probable that the mate took advantage of his condition to bring about a dispute between the crew and him. So soon as the men said they wanted their breakfasts, when ordered to refurl the foresail, the mate immediately, without a word of explanation, hurried off to the master with

a complaint of disobedience of orders, and the result was that the men were called aft and practically discharged. On the other hand, I do not think the libellants are wholly without fault. Although the refurling of the sail was not necessary to the safety of the vessel, it was proper and right that it should be refurled, if the officer in charge thought so. He had a right to have the sails furled to please his eye, and in accordance with his notions of what was professional and seamanlike. Some one must give the law upon these matters, and the general rule is, that the seaman must obey what his superiors command. Of course there is a limit, beyond which a seaman need not endure the caprices and persecutions of his officers, but may leave the ship and demand his wages. But this order was not an extreme one. Fifteen minutes at the farthest would have sufficed to refurl the sail; and although the libellants may have felt (as was probably the fact), that the order was given to punish and annoy them more than any thing else, yet they should have obeyed it after the master required them to do it, before breakfast. It also appears probable that the crew on Sunday morning were disinclined to work under the mate, and held back in the discharge of the morning's work, so that they furnished some excuse if not provocation for keeping them at work after the usual hour without their breakfasts.

In any event the order was not so unreasonable or oppressive as to justify the libellants in refusing to obey it, either absolutely or unqualifiedly. Nor was their qualified refusal, under all the circumstances, sufficient to justify their discharge, or work a forfeiture of their wages; particularly as they remained ready to go to work, until the master discharged them the next morning. I shall deduct one month's wages from the compensation due each of the libellants for his misconduct in this particular.

Counsel for the claimants also insist that the wages of the libellants are forfeited by virtue of a clause in the shipping articles which reads "that if any of the said crew disobey the orders of master or other officer of the said vessel, or absent himself at any time without liberty, his wages due at the time of said disobedience or absence shall be forfeited; and in case such person or persons so forfeiting wages shall be reinstated and permitted to do further duty, it shall not do away such forfeiture." This stipulation or clause is in derogation of the general rights of seamen as established by the maritime law, which does not allow a single act of disobedience, however trivial or provoked to work a total forfeiture of a seaman's wages. Such stipulations are held void by courts of admiralty "unless two things concur: first, that the nature and operation of the clause is fully and fairly explained to the seaman; and secondly, that an additional

compensation is allowed entirely adequate to the new restrictions and risks imposed upon them thereby." Brown v. Lull, [Case No. 2,018.] The burden of proof is upon the claimants to show both these things. No attempt has been made to prove either of them. Tried by this test, this stipulation is void. "Courts of admiralty are accustomed to consider seamen as peculiarly entitled to their protection;" and it is against the operation of such unjust and one-sided stipulations as this, obscurely placed among the many long lines of a closely printed formula at the head of the articles, that this protection is most required and given.

It only remains to consider the compensation which the libellants are entitled to receive. The general rule, when a seaman is wrongfully discharged during a voyage, is to allow him wages up to the termination of the voyage. But to this there are exceptions. In some instances the compensation given by this rule would be too great and in others too small. The damages in all cases should be equal to the real loss or injury of the party. Emerson v. Howland, [Case No. 4,441.]

The wages agreed upon were $35 per month for the round voyage. From the evidence it cannot be certainly known what time it will take to complete the voyage. On the argument it was admitted that the vessel was still in this port. The run from San Francisco here occupied just one month. The vessel has been in this port another month discharging and taking on cargo, and how much longer she may remain is not known. From what is known, it may be safely assumed that the return to San Francisco will occupy another month. The libellants shipped on the 14, 17 and 20 of August. This would make the duration of the voyage about three and a half months. If the discharge was wholly wrongful and without fault on the part of the libellants, the latter would be entitled to recover the stipulated rate of wages for this time, and also the sum of twenty dollars each, the price of passage from here to the port of shipment. From this must be deducted as to each of them the sum of one month's wages for misconduct, and also the advanced wages received by two of them. The articles do not specify what kind of money the wages were to be paid in. The usage is to pay in coin, and the money advanced to Nelson and Mills, was coin. In all probability it was the mutual understanding that the wages should be paid in coin. But the contract is for so much money, and it may be satisfied by the payment of any lawful money of the United States. Under these circumstances the court cannot decree that the wages shall be paid in coin, or that a greater sum per month than that agreed upon shall be paid in currency. However, the wages have been allowed for the round voyage. It is probable that the libellants might

have returned to San Francisco, in a month less time, if they had availed themselves of the opportunities that offered, immediately upon their discharge. Supposing that this decree would be paid in currency, I have upon this point, in the absence of testimony, presumed in favor of the libellants, and given them wages for three and a half instead of two and a half months. Decree for the libellants accordingly.

[NOTE. Wages of seamen will not be forfeited for slight faults: the disobedience must be of a very gross nature, involving serious danger, or it must be malignant or habitual, such as goes to the very essence of the contract. The Mentor, Case No. 9,427; The Maria, Id. 9.074; The Pioneer. Id. 11,176. For cases in which a partial forfeiture of wages was decreed because of disobedience. see The William Cummings, Id. 17,690; The Elizabeth Frith, Id. 4,361; The Jefferson Borden, 6 Fed. 301; The Antioch, 11 Fed. 165; The Moslem. Case No. 9,875. In the following cases it was held that the particular misconduct. complained of was not sufficient to warrant a forfeiture or deduction of wages: Smith v. The J. C. King, 3 Fed. 302; The Paul Revere, 10 Fed. 156; Marsland v. The Yosemite, 18 Fed. 331: Macomber v. Thompson, Case No. 8,919: Sprague v. Kain, Id. 13,250; The Magnet, Id. 8.955; The John Martin, Id. 7,358; Hayes v. The J. J. Wickwire, Id. 6,262; Snell v. The Independence, Id. 13,139; Lang v. Holbrook. Id. 8,057; The Mary Ann. Id. 9,194; The Olive Chamberlain, Id. 10,491.]